The third and final case on our docket is 23-30494 Vaughn v. American Cml Barge Line. Mr. Jenkins. Good morning. May it please the court, I'm Scott Jenkins on behalf of American Cml Barge Line. We cleared out the courtroom, so we must not have any exciting constitutional issues here in a maritime wage loss case. But nevertheless, we think it's important. We have appealed the judgment of June 22, 2023 by the lower court in favor of the plaintiff, Jamal Vaughn, who was a Jones Act seaman injured in the course and scope of his employment with American Cml Barge Line. Specifically, the appeal relates to the court's award of past and future wage loss. Now, with respect to wage loss, we refer this court to its en banc decision in Culver v. Slater Boat Company, 1983 decision, which really has been the sort of standard in terms of the factors for courts within this circuit to consider for determining wage loss in a maritime personal injury case. The court in Culver and other courts at the time had noted that trying to determine wage loss for a Jones Act seaman was very speculative. The factors considered by courts had been inconsistent, somewhat confusing, and Culver was an attempt by this court to try to clarify that, to try to create some certainty, but at least some consistency in how these claims are calculated. And through the court's guidance in Culver, too, the following factors are what are utilized by economists and other wage loss experts in maritime cases to determine wage loss, both past and future, for a Jones Act seaman. The first factor is to estimate the loss of work life or the expected remaining work life. That's easy. That's just the number of years he has that he'd be expected to work. Secondly, it's to calculate the lost income stream. And third is to compute the total lost income stream. Those two go together, and that's what's important for purposes of this appeal, because that's where we believe the trial court committed error. That is, to determine the lost income stream, you have to determine the base wage rate. Now, under Culver, the base wage rate is, in fact, what the individual was earning at the time of the accident. Now, that can be adjusted, but to do so, you have to have evidence that would warrant doing that. So what the court in Culver had explained, and the courts following Culver have explained, is that you don't increase the base wage rate for just general statistical purposes, like just a consumer price index or something like that, or just to account for inflation. You don't do it. And you don't increase it for anticipated annual increase in earnings unless there is specific evidence presented in the case that the individual at issue would have had increased earnings over time. Absent that, you just use the good old-fashioned base wage rate. And that is, going forward, the other piece of this where we think the judge committed error is, in applying to that the wages that the injured party is capable of earning. Granted, he's probably going to have reduced earnings because of some physical limitations because of the injury, and we'll address that further in a minute. But the court has to look to see what the earning potential is of the individual, and that number determines how much the future wage loss is to be reduced, or in the case of the obligation of a plaintiff here, how much that loss should be mitigated by him. So with respect to the court's ruling in this case, setting the tone with Culver and its applicability, the court, on the reasons for judgment, on page 7, paragraph 17, spends all of one paragraph talking about wage loss. And there's not even a reference to Culver in that paragraph. But starting first with past loss wages, the court says this. The plaintiff's economist estimated Vaughn's loss of earnings from date of accident until trial as $221,246, which the court finds reasonable. That's fine on its face, but we need to look further into the plaintiff's economist's report. It's wrong for two reasons. First, he increased the base wage rate by 3.7 percent annually from 2017 to 2022, which resulted in the $58,000 a year that everyone agrees he was earning for ACBL at the time of the accident, increased it to $67,000 to create the new base wage rate that was used not only to determine past wages, but was also sort of the beginning of the analysis and the computation for future wage loss. That 3.7 percent increase was not based on any evidence that he would have been promoted or otherwise gotten any kind of salary increase at work, but rather it was based on the employment cost index, which translated is inflation. That's improper under Culver. Culver clearly states that. So he should not have increased the wage rate by 3.7 percent annually with regard to past loss wages. That's one error. The other error is the economist, Shale Wolfson, concluded that in calculating the plaintiff's past wage loss of $221,246, he concluded that the plaintiff was not able to return to any gainful employment before trial. That's simply not true. There were three functional capacity evaluations performed on the plaintiff during the time of his treatment, all of which indicated objectively, and everyone admits that that's an objective test. That takes out any subjectivity at all on the part of the plaintiff. That is objectively what he can do. All three functional capacity evaluations indicated that the plaintiff was capable of performing light to medium duty work. Now, all three of his treating physicians testified at trial, and they said that, yes, they agreed with those findings, and, yes, he's capable of working. That's before trial. Then enter the voc rehab counselors, those experts. They come in. They take that information, and then they go out and do a labor market survey to determine what wages the plaintiff is capable of earning in the future based on the physical limitations indicated in the FCEs. Now, those two, there were two, in all cases like this, there are competing experts. With regard to voc rehab, there were two, and there was an expert for the plaintiff and an expert for a defendant. And while their opinions did differ somewhat in the range of salaries, it's undisputed that around the midpoint range, there were numbers where they had overlap, and that was at $28,000 to $29,000 a year. That's what the plaintiff's own voc rehab counselor said. Based on what he can do, based on his abilities, my testing of him, the doctor's approval, he can earn $28,000 to $29,000 a year. The plaintiff's economist, for whatever reason, calculated the past wage loss based on not having the ability to return to work, based on no return to work. I mean, so basically the plaintiff was rewarded for simply not trying to mitigate his losses and return to work. There's no evidence that at that time he wasn't capable of working. His doctor said it, voc rehab indicated it, and the FCE, this is most importantly, the FCE objectively established that he was capable of working. But for whatever reason, that $221,000 doesn't take into account the ability to return to work. Our economist, Dr. Ken Boudreau, did calculate past loss wages based on the base wage rate that had not been improperly inflated by him, as the plaintiff expert did. He also took into account the wages that the plaintiff was capable of earning. And to give the plaintiff the benefit of the doubt, he didn't go back to the first FCE that said he could work. He used the most recent one, the last one, which actually worked the plaintiff's favor. But that came out to about $182,000, and it's in his report, as to what he thought the past loss wages would be. That's a difference of around $38,000 for past wage loss. Granted, that's not a big number, probably wouldn't appeal that. But for the next issue, which is the bigger one, which is the future wage loss. Now, this is what the judge said in the findings with regard to future wage loss. The court finds that Mr. Vaughn is capable to engage in light to medium duty employment. That's true. The judge acknowledged that. But he says extrapolating from the calculations by competing economists, the court finds that the wage loss is $750,000. Now, I'll discuss that number, which is completely looks to be a compromise or a middle ground. I'm not sure because there's no explanation other than what I just read. That's all we know about how he arrived at that number. But obviously, he did consider in large part the number from the plaintiff economist, which was 1.373, $1,373,909. So almost $1.4 million for future wage loss. But much like the past wage loss, the economist incorrectly calculated the base wage rate, which as noted earlier under Culver is an extremely important factor in complying with Culver and trying to bring some uncertainty to a process that oftentimes is very uncertain. But he did 0.8% annual increases to the base wage rate without any explanation why. And all we know is that that came from the Congressional Budget Office. That's all we know. That's what it came from. It has nothing to do with the plaintiff in this case. It has nothing to do. If you want to know if the plaintiff would have been promoted, then go take the deposition of ACBL. Or if somebody at trial from ACBL, ask them. Say, hey, what was he going to be promoted? What's your general increase in salary every year? Do you do an increase every year just for cost of living increase? What do you do? No evidence of that. There's no evidence of that. And any effort to do so by just including generalized information is improper under Culver. So the 0.8% annual increase was not proper. But also here's the bigger issue. With regard to the plaintiff's working capabilities, what he's able to earn, earning capacity, the plaintiff's expert concluded that he could earn $15,000 a year minimum wage. That's it. But his own voc rehab counselor said he could earn $28,000 to $29,000 a year. I mean, it's half. So the wage rate that they used for the future to get to this almost $1.4 million in future wage loss was based on half of the plaintiff's earning potential as noted by his own vocational rehabilitation counselor. It makes no sense, and I have no idea as to why the plaintiff's economist would have disregarded the numbers from the plaintiff's own vocational rehabilitation counselor. Now, and so the judge then said, looking at the 750, he clearly tried some kind of compromise. You know what, I'll just find something in the middle and everybody goes away. But I don't know that that's what he did. But he clearly referenced both experts. So he obviously considered to some degree on the $1.4 almost million of future wage loss from the plaintiff's expert. But even if he said, you know what, I think in fairness I'm going to find the middle ground, you know, that's not proper. It's got to be based on something. I mean, and so if the plaintiff can provide an inflated economist report for future wage loss, inconsistent or not in compliance with Culver, but it's okay for the judge to just find a middle ground and that's fine. Well, I mean, the blueprint now going forward for the plaintiff bar is simply, hey, inflate these future loss reports and the judge will find something in the middle, and therefore we get a compromise because the Fifth Circuit said that's okay. And so now we've got a plan going forward. Then you get a higher number. That defeats the purpose of Culver and the directive of the court in Culver. We addressed these issues in a motion in Lemony, specifically the issues as to the economist's improper increase of the base wage rate. That was addressed in a motion in Lemony prior to trial, fully briefed. At trial we raised it again. The court said it just didn't rule on it and said I don't need any further briefing on it. Thank you. And then went on to rely on the very thing we were trying to exclude in the motion in Lemony. Look, I know a trial court has a lot of discretion. He sits there and he hears the witnesses. I've been doing this long enough that I fully appreciate that. But you've got to—there's got to be some rules, and this court sets some ground rules in Culver, too, to bring some degree of certainty and uniformity and consistency to this process, and this judge completely disregarded that. And, you know, he's also a gatekeeper with experts. I mean, that's one of his purposes is be the gatekeeper. And in this case, I mean, not only did he not guard the gate, but he relied on the very evidence that we were trying to exclude and that he should have excluded by granting our motion in Lemony because it's clearly improper. So in the just a few minutes I have left here, I just want to briefly address, the plaintiff also has filed an appeal, and that's for punitive damages for failure to pay maintenance and cure. I would only point out that, you know, I think this is a non-issue. The transcript of trial is very clear on this issue. I thought it was resolved, but, I mean, I'm not saying it was settled, but I thought we at least had resolved it because even over our objection and our disagreement, we simply paid because the judge said to the parties, fix this. I don't want to hear about it. You go outside during break. When you come back here, I want it resolved. So basically, we just paid it. That's fine, but we just paid it. But essentially, we paid $149,000 in medical expenses in this case. Obviously, ACBL didn't have a problem paying. There were about $30,000 that were disputed. Plaintiff counsel kept sending it to our client. Our client said, fine, we'll pay it, but we need more information. For example, plaintiff counsel claimed that he paid some of these. They said, okay, fine, give us evidence of payment. We're happy to do it. I will tell you this, that the record is completely void of any response from plaintiff counsel when we ask for more information. There was no witness at trial, no documents produced at trial to show in any way that he ever gave us the information requested. We think that whole punitive damages issue is a non-issue again, as reflected, I think, in the trial transcript. Thank you. Pleased to court. I'm Jim Hall for the Plaintiff Appellee. The first issue that I want to cover is the future loss of wages. Judge Barbier, who was the trial court judge, he didn't take either side. He didn't take the plaintiff's economist. He didn't take the defense economist. And he says in his judgment, extrapolating from calculations by competing economists, the court finds $750,000 for lost wages. So he took everything into an account, and that's how he erupted his decision on the $750,000 future lost wages. Our economist was a heck of a lot higher than that. At one point, it was like $1.9 million. But, you know, in Judge Barbier, he also took into account that at the time the plaintiff was injured, he was 22 years old. At the time it went to trial, he was 27 years old. He said that he could go back to some type of light to medium duty work, and he also stated that he realizes that he's going to have a 50% loss of future earning capacity because of these injuries. So Judge Barbier was more than fair about that, I believe. Actually, I wish it had been higher for us, but it is what it is. Counsel, do you agree with your friend on the other side? I'm sorry? Sorry. Can you hear me okay? Do you agree with your friend on the other side that a district judge can't just pick a number in the middle, the way sometimes juries can, that if you're going to do $750,000, you have to explain, basically show your math and say, I'm using this baseline, I'm using this projection, I'm discounting for this reason. Do you agree with him, at least to the legal proposition, that the district judge has to explain where $750,000 comes from? Well, you know, he's saying he's extrapolating from both economists' reports. I mean, I would think that that might be enough. Well, I would think, you know, the economists can't just pick numbers, right? The economists have to show their inputs, show their methodologies, show the way that they're inflating or discounting, right? I mean, the whole point of the expert report is that they're showing their work, and then there's a battle of the experts. You can either pick one of those two and say, I think this one's more credible than that one, or you can say, actually, I have a different set of math, but I would think you would need to at least explain, here's where I started, here's step two, here's step three. Two plus two is four. I picked four. No? Does the rules not require the judge to do that? I'm not sure, to be honest with you. I mean, I'm sure Judge Barbier did that in his own way to arrive at his figure. I mean, I can't say he didn't. I can't say he did. You know, I don't know. Well, because if there's no requirement that the judge at least say, here's where I got my number, then it's effectively unreviewable by a court of appeals, right? Because there's no way to decide. I mean, because you would imagine if the judge said, look, I'm going to start with two, I'm going to add two, and I'm going to get nine, well, we would obviously be able to review that and say, well, obviously something went awry and the judge is busy and has a lot to do, but we're going to send it back to do the math correctly. But if the judge just says my answer is nine, we have no way of knowing, right, and effectively can't review. I understand what you're saying. I do. I do. But like I said, again, you know, he mentioned extrapolating from both reports, and he brought up that figure, but I understand what you're saying. On what basis? I mean, the problem is if, for example, the plaintiff's economist did include improper measures of future earnings, and we can't tell if the judge took that into account in extrapolating, we don't know. I agree. You know, I feel what to say. It's kind of like it seems to me medical expenses are more clear cut to me than future damages. I mean, you've got the medical bills. The judge can't say, well, I'm going to add on $50,000, or the jury can't do that. Right. It seems like we're . . . Yeah, I understand. I do. The second point is past loss wages. Defense counsel talks about three FCEs. The first FCE was regarding the two shoulder surgeries that he had. His doctor did release him after the two shoulder surgeries, and the FCE said he could go back to work regarding his shoulder. He was never released by his treating physician, Dr. Todd. Dr. Todd testified at trial that he never told the plaintiff that he could go back to work. He never told him that. And as far as FCE goes, I mean, we all know that that's just another tool in a treating physician's toolbox to determine if a patient can go back to work or not. And in this case, Dr. Todd never told him. And then, plus, he was still receiving these injections also, too. The plaintiff stated that, you know, he would get an injection, he'd feel good for a little while, bam, and all of a sudden it would hit him again. So, you know, again, his treating physician never told him he could go back to work. Now, switching sides for a minute, there's a cross-appellant regarding arbitrary and capriciously not paying past medical bills or cure bills. This accident happened in January of 2018. The medical bills that the defendants didn't pay until the time of trial date back to March of 2018. They were receiving regular medical records and bills. Every time we received a bill and a record, we sent it to the defendants. They had all this stuff. February, we stipulated to some e-mails. One of the e-mails was that February 25 of 2021, Glenn Goodyear was the defense attorney at the time on this case. He wrote an e-mail to me saying his client will pay all the past medical bills and all the past diagnostic testing. Never happened. Again, back in May, I'm sorry, June of 22, sent him more updated records. I'm not sure if it was Mr. Jenkins or not who had the case at the time, but sent him more records saying, hey, you never did pay this, not to mention numerous phone calls. It was never paid. May 31 of 23, right before trial, again we sent him medical records and bills. And this time we sent him canceled checks because this is the first time they ever asked for this. And let me back up for a minute. After Glenn Goodyear wrote that e-mail, that was after our first failed mediation that he said we're going to pay the medicals. They never were paid. During trial, Judge Barbier seemed like he got a little aggravated, and he said, told them, pay the bills. If you got the records, pay the bills. They paid it during trial, and then, of course, I reserved my rights to come to you all and ask for punitive damages and attorney's fees because for over two and a half years, they had all these records. They had all these bills. Every time the plaintiff treated, we sent them a copy of the medical record. Every time we got a new bill, we sent it to them. And it wasn't until the middle of trial that they paid the bills. So for two and a half years, it went unpaid. I mean, if there was ever a case that, you know, warranted punitive damages and attorney's fees, this is it. There's no excuse for it. There's no reason for it other than being arbitrary and capricious, you know, during the whole time. If you have any questions, I'll be happy to answer. No? Thank you. I'll be very brief, and I'll just respond just to what Mr. Hall had said. So with regard to the FCEs, I stated previously that there were three FCEs. The evidence, we believe, shows that each FCE showed him capable of working at a light to medium duty job. But what those earlier FCEs showed is really not at issue because we indicated that we calculated the past wage loss based on the third FCE, which they're not contesting. So we indicated that we gave the plaintiff the benefit of the doubt and didn't use those earlier FCEs, notwithstanding that his physicians approved of them and indicated that he was capable of working even at that time. The fact that the plaintiff was not told that he could work is absurd. I mean, the FCE, he participated in the FCE, he knew the results of the FCE, and the doctor's notes indicate that Dr. Todd said discussed FCE. I'm paraphrasing. I discussed FCE with Jamal and, you know, something discussed the FCE and his ability to return to work. It's in the doctor's notes. He said he discussed the FCE, but for some reason the plaintiff says that he didn't talk to his doctor. The fact that he's seeing his treating physician, they discussed the FCE, which says what he can do, and for some reason the doctor didn't say he could work. I just don't know that I have ever in 30 years had a situation where that communication didn't take place between a treating physician and the patient. Didn't he testify that he called some employers to see if they could accommodate his limitations, and they said no? Is that not right? He may have, but I don't recall that. But, I mean, he was given the list of people or the potential people to call, and if he said that it was just a general statement that he called some people to ask, but I seem to recall we asked about that at trial and he was not able to provide details, but he didn't call the people that they identified that they had already found that had jobs available where he could work. He didn't call them. He just said he called others. Okay. We will ask him at trial. I said, Mr. Vaughn, I said, in all due respect, you know, we have the FCEs. We have your treating physician's testimony. I mean, the voc rehab experts, everybody in this case, everybody in this case but you, Mr. Vaughn, everybody in this case believes that you can work, but you. And I said, why is that? And he said, I don't know. I don't know. And I guess I'm still hurting. I don't know. He had no answer. Now . . . What's your best case to respond to Judge Oldham's question that a district court judge in ruling on future earnings has to give us some idea when he picks a number that is different from either expert? Well, I agree with the premise that the judge has to provide some explanation. It doesn't have to . . . What's your best case? Best case in terms of us in this case or best case in terms of what the judge should do? Yeah. I mean, is there a case that says a judge just can't come to a compromise verdict, basically, on future earnings? One expert says a million and another says two. The judge says 1.5. Is there a case law that says the judge can't do that without explaining how they got to 1.5? Well, I thought that I would defer to the cases we cited in the brief. I thought that the cases that we cited at least discuss what the judge must include in his reasoning. But I would say in response to that, if there is a situation where a judge can take competing experts and come in and have a compromise ruling, I mean, again, I think he has to explain that. We don't know where he's coming from. But if the cases were to say, okay, you can do that, well, it still has . . . The high end here, their expert, was not in accordance with Culver. And he acknowledges extrapolating from both. I interpret that to mean that he at least considered that. And I think that was the high end. I think that what we would ask this court to do would be respectfully to reverse and render based on the expert report of the defendant, the numbers of which are set forth in our brief. And I'll only do a last response to the issue of the punitive damages issue. We never got information that we requested. The record shows that. And these cancel checks that he said he provided, we paid when we got those, which is evidence that if he gave us what we asked for, we would have paid. Thank you. Thank you. That will conclude the arguments for this week. The cases we have heard are under submission. Thank you.